MEDCOST, L.L.C., Appellant,

v.

Robert LOISEAU, Special Deputy Receiver of American Benefit Plans, et. al., Appellee.

No. 03–04–00489–CV.

Court of Appeals of Texas, Austin.

May 26, 2005.

Jan P. Patterson, J., dissented and filed opinion.

**424**

Lee L. Cameron Jr., Amy E. Stewart, P. Jason Skuda, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, Dallas, for appellant.

Jane M.N. Webre, Cynthia S. Connolly, Natalie B. Scott, Scott, Douglass & McConnico, LLP, Austin, for appellee.

Before Chief Justice LAW, Justices PATTERSON and PURYEAR.

## OPINION

Opinion by Justice PURYEAR.

Appellant MedCost, a preferred provider organization ("PPO"), filed a special appearance in this action concerning the receivership of certain health insurance companies after the receiver, appellee Robert Loiseau,[1] joined MedCost as a defendant to collect for claims made against the entities in receivership ("the Neal entities").[2] The district court denied Med-Cost's special appearance, and this interlocutory appeal followed. Because we hold that the district court cannot properly exercise personal jurisdiction over MedCost, we will reverse the judgment.

## BACKGROUND

MedCost is a Delaware corporation with its principal place of business in North Carolina. As a PPO, it organizes and maintains a network made up of lists of health care providers practicing only in North and South Carolina who agree to provide services at pre-negotiated rates to clients of the PPO. MedCost sells its PPO lists to larger PPO organizations, which provide the lists to employers and health

---

1. Appellee is the Special Deputy Receiver for the following entities: American Benefit Plans; National Association of Working Americans a/k/a National Association for Working Americans; United Employers Voluntary Employees Beneficiary Association; United Employers Voluntary Employees Beneficiary Association I; Electronic Benefits Group, Inc.; Enhanced Health Management, Inc.; Four Corners Company, LLC a/k/a Four Corners Co. LLC, a/k/a Four Corners Corp.; American Association of Agriculture, Forestry and Fishing Workers; American Association of Transportation, Communication, Electrical, Gas and Sanitary Workers; American Associ-

ation of Wholesale Trade Workers; American Association of Manufacturer Workers; American Association of Service Workers; American Association of Construction Workers; and American Association of Professional Workers.

2. Robert David Neal, a Texas resident, operated several fraudulent insurance companies based in Texas, including American Benefit Plans, United Employers Voluntary Employee Beneficiary Association, and National Association of Working Americans, all of which are now in receivership in Texas.

insurers. MedCost does not handle claims for health care recipients or providers and does not provide health insurance.

MedCost contracted with American Healthcare Alliance ("AHA"), a national PPO based in Missouri, giving AHA access to MedCost's North and South Carolina networks. AHA independently contracted with Progressive Administrators Resources ("PAR"), a third-party administrator in California, giving PAR access to the AHA network, which, through AHA's contract with MedCost, included MedCost's network. UltraMed, an Oklahoma entity, contracted with PAR for third-party administrator services and claims processing and American Benefits Plan (ABP), one of the Neal entities based in Texas, to pay the networks and route claims.

ABP provided the UltraMed Choice Health Plan to its insureds, including residents of the Carolinas. The card issued by the UltraMed Choice Health Plan indicated that the insurance was sponsored by the National Association of Working Americans ("NAWA") and referenced the United Employers Voluntary Employers Beneficiary Association ("UEVEBA") and PAR. ABP, NAWA, and UEVEBA are all Texas entities with their principal places of business in the Dallas–Fort Worth area.

MedCost did not enter into contracts with UltraMed, ABP, NAWA, UEVEBA, or Neal, but it did approve the UltraMed insurance identification card for use in its network in the Carolinas. It received $3 monthly from AHA for each of the 379 individual insureds in the Carolinas who enjoyed access to the MedCost network through the NAWA UltraMed plan. They and the health care providers suffered losses when the NAWA UltraMed coverage turned out to be worthless. The Texas companies were ultimately placed into receivership, and MedCost terminated access to its network,[3] issuing an internal email reporting that the coverage should have raised a "red flag" from the beginning because UltraMed was a coalition of employees.[4]

Robert Loiseau is the receiver for ABP, NAWA, and UEVEBA, as well as other companies. The receivership court found that these companies engaged in improper insurance practices by creating, marketing, and selling unauthorized health insurance plans, collecting money, and failing to pay claims. When the Texas companies went into receivership, the Receiver was charged with paying claims of insureds and providers, including those within MedCost's network. North and South Carolina insureds with claims against ABP and related companies in receivership have assigned their claims to the Receiver. Various departments of insurance in states where ABP and related entities offered insurance decided it would be easier and cheaper to handle all these claims in one state, Texas, because the largest number of ABP insureds and claims come from this state and because the Neal entities were based here. None of the claims of Texan insureds or claims originating in Texas involved MedCost's networks. The Receiver has filed suit against MedCost seeking damages under section 101.201 of the Texas Insurance Code for assisting in

---

3. The record reflects that MedCost terminated network access after MedCost had become aware of UltraMed's connection to the Neal entities and of Neal's having encountered legal problems in Texas concerning his health insurance businesses and after UltraMed had failed for the second time to pay fees for a period of several months.

4. MedCost's policy is to disfavor coverage provided by coalitions of employees because it believes such arrangements are not legal in some states.

the procurement of the illegal insurance contracts.[5]

MedCost filed a special appearance, which the district court denied after a hearing. MedCost appeals that denial, claiming that it does not have minimum contacts with Texas sufficient to confer personal jurisdiction upon Texas. The Receiver counters that, because MedCost's contracts facilitated the Texas-based entities' providing illegal health insurance to users of MedCost's network in the Carolinas, the trial court properly held that MedCost is subject to personal jurisdiction in Texas, where all the receivership entities are based.

## DISCUSSION

### Standard of Review

Whether a court has personal jurisdiction over a defendant is a question of law, which we review *de novo*. *American Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, *805–06* (Tex.2002); *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex.2002). However, where the trial court issues findings of fact and conclusions of law in denying a special appearance, the conclusions of law are reviewed *de novo* and challenged fact findings are reviewed under no-evidence and insufficient evidence standards for legal and factual sufficiency. *Marchand*, 83 S.W.3d at 794; *Botter v. American Dental Ass'n*, 124 S.W.3d 856, 861 (Tex.App.-Austin 2003, no pet.). In this case, MedCost argues that the court's findings of fact and conclusions of law are factually and legally insufficient to confer jurisdiction.[6] We assume for purposes of this analysis that the court's findings of fact are supported by sufficient evidence, but because we hold that the court's conclusions of law are erroneous, we must reverse and need not decide the sufficiency of the evidence supporting the fact findings.

## Jurisdiction

■ Texas courts may exercise jurisdiction over nonresident defendants if the Texas long-arm statute authorizes the exercise of jurisdiction and that exercise is consistent with federal and state standards of due process. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex.1991); *Botter*, 124 S.W.3d at 861. The Texas long-arm statute permits courts to exercise personal jurisdiction over a nonresident defendant when such power is permitted by the federal constitutional requirements of due process. Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041–.045 (West 1997); *Marchand*, 83 S.W.3d at 795; *Pessina v. Rosson*, 77 S.W.3d 293, 297 (Tex.App.-Austin 2001, pet. denied) (broad language of statute permits expansive reach limited only by federal requirements of due process). Federal standards of due process require that (1) the defendant has purposefully established minimum contacts with Texas, and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Marchand*, 83 S.W.3d at 795 (citing *International Shoe Co. v. Washington*, 326 U.S.

---

5. Section 101.201(a) reads:
 "... A person who in any manner assisted directly or indirectly in the procurement of the contract is liable to the insured for the full amount of a claim or loss under the ... f the contract if the unauthorized ... fails to pay the claim or loss."

Tex. Ins.Code § 101.201(a) (West Supp.2004–05).

6. Specifically, MedCost challenges Findings of Fact 8–29 and Conclusions of Law 1–4.

310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)); *CSR, Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex.1996). If the defendant has not purposefully established minimum contacts with the forum state, the exercise of jurisdiction cannot comport with traditional notions of fair play and substantial justice. *International Shoe*, 326 U.S. at 316, 66 S.Ct. 154.

■ The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the long-arm statute. *Marchand*, 83 S.W.3d at 793. Upon filing a special appearance, a nonresident challenging personal jurisdiction assumes the burden of negating all jurisdictional bases. Tex.R. Civ. P. 120a; *Coleman*, 83 S.W.3d at 807 (citing *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex. 1985)). If the plaintiff has failed to sufficiently allege personal jurisdiction, the defendant can defeat personal jurisdiction by presenting evidence that it is a nonresident. *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 438 (Tex.1982).

■ Under the due process analysis, we must apply the "ultimate test" of minimum contacts: whether the nonresident defendant has purposefully availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Burger King*, 471 U.S. at 475, 105 S.Ct. 2174; *Botter*, 124 S.W.3d at 862. The "purposeful availment" requirement ensures that a defendant will not be called into court in a jurisdiction based only upon random, fortuitous, or attenuated contacts, or the unilateral activity of another party or a third person. *Burger King*, 471 U.S. at 475, 105 S.Ct. 2174; *Guardian Royal*, 815 S.W.2d at 226. Rather, the activities in the state must have been intentional. *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex.1990). The activities conducted in the forum state

must justify a conclusion that the defendant should reasonably anticipate being haled into court in that state. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The minimum contacts analysis protects a foreign corporation from suit in a Texas court if its relationship with Texas is so remote or attenuated that it could not reasonably anticipate having to defend itself in a Texas court. *Id.* Foreseeability is an important consideration in deciding whether a nonresident defendant has purposefully established minimum contacts with a forum state. *Id.; Marchand*, 83 S.W.3d at 795; *Guardian Royal*, 815 S.W.2d at 227.

■ The jurisdiction of Texas courts is always dependent on the defendant's having some minimum contacts with Texas, but the requisite extent of those contacts varies depending whether the type of *in personam* jurisdiction in question is specific or general. *Guardian Royal*, 815 S.W.2d at 227; *Botter*, 124 S.W.3d at 862. The exercise of personal jurisdiction is proper if the nonresident defendant's minimum contacts give rise to either specific or general jurisdiction. *Marchand*, 83 S.W.3d at 795 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413–14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)); *Guardian Royal*, 815 S.W.2d at 226.

### Specific Jurisdiction

■ A court may exercise specific jurisdiction over a nonresident defendant when the defendant's purposeful contacts with the forum give rise to or are related to the cause of action. *Coleman*, 83 S.W.3d at 806; *Guardian Royal*, 815 S.W.2d at 228. In analyzing minimum contacts for purposes of Texas courts' specific jurisdiction, we focus on the relationship among the nonresident defendant, the

forum, and the litigation. *Botter,* 124 S.W.3d at 862 (citing *Guardian Royal,* 815 S.W.2d at 227).

■ The Texas Supreme Court has developed a formula to determine whether specific jurisdiction exists sufficient to satisfy the federal constitutional standard: (1) the nonresident defendant or foreign corporation must purposefully take some action or consummate some transaction in the forum state; (2) the cause of action must arise from or be connected with such act or transaction; and (3) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, considering the quality, nature, and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation. *Botter,* 124 S.W.3d at 862 (citing *Schlobohm,* 784 S.W.2d at 358). Thus, before a Texas court can assume specific jurisdiction over MedCost, it must find that MedCost purposefully performed some act in Texas and that the controversy arose out of that act. *Helicopteros Nacionales,* 466 U.S. at 415, 104 S.Ct. 1868.

MedCost argues that personal jurisdiction is improper because its contacts with Texas occurred only through the contract of a third party and are at best remote and attenuated because of the nature of the chain of contractual relationships—MedCost contracted with AHA for access to its network, but AHA was the entity that provided the network to Texas-based insurers through AHA's contracts with Oklahoma-based UltraMed to which MedCost was not a party. *See Burger King,* 471 U.S. at 475, 105 S.Ct. 2174; *Hitachi Shin Din Cable, Ltd. v. Cain,* 106 S.W.3d 776, 784 (Tex.App.-Texarkana 2003, no pet.) (Chinese manufacturer's contract to ship goods at French company's direction did not constitute purposeful availment of privileges of doing business in Texas when Chinese company complied with French company's directive to ship goods to Texas).

■ The Receiver, however, points out contacts other than the contractual relationship.[7] He argues that there are sufficient contacts for Texas to assume specific jurisdiction over MedCost because MedCost's approval of the identification cards listing the Texas companies constituted an intentional act that gave rise to this cause of action and because the impact of MedCost's act is felt in Texas. MedCost responds that because it does not have minimum contacts with Texas, the trial court should have granted its special appearance. We will examine each of MedCost's alleged extra-contractual contacts with Texas in turn.

---

7. Although the parties agree that MedCost did not contract directly with any of the Texas insurance carriers at the time this cause of action arose, the Receiver argues that MedCost's business dealings with the receivership entities constituted a *de facto* contractual relationship. We note that simply contracting with a Texas resident alone is not enough to establish minimum contacts with this state. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 478, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Blair Communications, Inc. v. SES Survey Equip. Servs, Inc.,* 80 S.W.3d 723, 730 (Tex. App.-Houston [1st Dist.] 2002, no pet.) ("We do not believe that initiating contract discussions with a Texas resident, and subsequently entering into a contract, in addition to making payment in Texas, are sufficient contacts with Texas when the entire substance of the contract is performed outside the state."). Thus, contrary to the dissent's suggestion, MedCost's "profit-based relationship" through an attenuated chain of contracts with others cannot confer personal jurisdiction, nor can the fact that MedCost ultimately received moneys from Texas entities through UltraMed, PAR, and AHA.

### Identification Cards

 The Receiver argues that MedCost is liable for the losses resulting from NAWA's and UEVEBA's failure to pay claims because MedCost allowed both to provide unauthorized health care coverage to insureds using its network. He argues that MedCost acted affirmatively to allow access by approving the insurance identification card that brought its network together with the unauthorized coverage, and because that coverage came from Texas, the Receiver argues, MedCost could expect to be sued here. The identification card that MedCost approved lists the names or includes the logos of UltraMed, NAWA, AHA, PAR, and MedCost. Upon receipt of a sample card, MedCost evaluated it according to its "Payor Repricing ID Card Check List" and its "New Client Check List," and approved it for use by insureds accessing MedCost's network of health care providers in North and South Carolina. The Receiver argues that this checklist and procedure show that MedCost served a gatekeeping function and that MedCost is liable for its failure to properly screen the companies using its network.[8]

In order to show that the approval of the card constituted sufficient minimum contacts for specific jurisdiction, the Receiver must show that, by approving this card, MedCost performed an action in Texas and that the approval gave rise to this cause of action. *See Schlobohm,* 784 S.W.2d at 358. While MedCost might be liable for its failure to gatekeep, the relevant inquiry here is whether its approval of the identification card was an act taken in Texas, not whether MedCost should have allowed the Neal entities access to its network. The merits of the Receiver's case against MedCost are not now before us. *Morris v. Kohls–York,* No. 03–04–00371–CV, 2005 WL 1034082, at *7, 2005 Tex.App. LEXIS 3404, at *13 (Austin May 5, 2005, no pet. h.).

The Receiver does not argue that MedCost's approval of the cards took place in Texas rather than in North Carolina, where MedCost's operations are located. Instead, he argues that it is sufficient that MedCost knew that the entities it was approving were Texas-based.[9]

We are willing to grant that it may have been foreseeable to MedCost that the Neal entities would misuse its network, but the foreseeability we are concerned with for purposes of our due-process analysis is whether MedCost could reasonably have expected to be haled into court in Texas for the Texas companies' misuse of that network in the Carolinas. *World–Wide*

---

8. MedCost argues that it approved the form of the card, not a plan or coverage, merely ensuring that information reflected on the card was accurate. It characterizes the process as administrative in nature and designed to ensure that the necessary information was recorded and relayed to providers in the Carolinas. Whether MedCost had a duty to further investigate is relevant to the merits of its liability, but not to the question of whether it took an intentional act in this state.

9. We note that UltraMed was based in Oklahoma, and that, under the Receiver's argument, even though the other Neal entities were based in Texas and the injury was to insureds in the Carolinas, because MedCost affirmatively approved an identification card listing an Oklahoma company which eventually failed to pay claims in the Carolinas, MedCost could reasonably expect to be haled into court in Oklahoma as well. It may be suggested that MedCost's relationship to Texas was more substantial because it approved more Texas companies' use of its network, but the nature and quality of the relationships were the same. *See American Type Culture Collection v. Coleman,* 83 S.W.3d 801, 810 (Tex.2002) ("Rather than the quantity of contacts with Texas as compared to other jurisdictions, we look to the nature and quality of those contacts.").

*Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559; *Guardian Royal,* 815 S.W.2d at 227. MedCost's network dealt only with claims originating in the Carolinas and included health care providers only in the Carolinas. In fact, the causes of action that the Receiver is now asserting belong to residents of the Carolinas and arose in the Carolinas when the Neal entities failed to pay claims in the Carolinas. For failing to adequately protect its customers in the Carolinas from injury from other entities, it is foreseeable that MedCost would be called into court in those states. However, it was not foreseeable that MedCost would be called into court in Texas for failing to do its job in the Carolinas by members or users of its network in the Carolinas who were injured by entities that happened to be based in Texas, because MedCost did not purposefully avail itself of the privilege of doing business in Texas. Purposeful availment may not be based upon such random or fortuitous contacts with a state. *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174; *Guardian Royal,* 815 S.W.2d at 226.

The Receiver argues that, under the insurance code, MedCost's actions constituted procurement. *See* Tex. Ins.Code Ann. § 101.201(a) (holding persons liable who in any manner assisted directly or indirectly in the procurement of fraudulent insurance contract). Through its own action, the Receiver argues, MedCost "allowed" the unauthorized coverage, which came from Texas entities. We find this argument aimed again at the merits of MedCost's liability. The question before us now is not whether this is procurement; the question is whether the alleged procurement happened in Texas. The Receiver does not adequately plead that MedCost acted in Texas by approving the identification card for use in the Carolinas.

It is suggested that Texas is the locus of a nationwide fraudulent insurance scheme and that therefore all the claims that relate to that scheme are properly brought here. MedCost, however, is not being sued because it conducted certain activity that was "nationwide," but for assisting in the procurement of insurance contracts under which unauthorized insurers failed to pay claims. *See id.* Therefore, any liability of MedCost here would be for failure to protect the North and South Carolina insureds and providers in its network from the illegal contracts it allegedly assisted in procuring. The fact that the same fraudulent insurers may have also injured insureds or providers in other states, including their home state, has no bearing on MedCost's liability on the claims that the Receiver asserts here. Nor did the nationwide scope of the Neal entities' scam have anything to do with the character of the causes of action. That is, we cannot examine the behavior of other entities whom MedCost allowed into the Carolinas, geographically locate the greatest concentration of all of those entities' misdeeds, and then bring MedCost into court wherever that may be; it is MedCost's actions that matter, and those actions both occurred in the Carolinas and jeopardized only residents and consumers in the Carolinas. Other unilateral actions by the Neal entities, such as their choice to headquarter themselves in Texas and not, for instance, Nevada, cannot justify our exercise of personal jurisdiction over MedCost. *See Burger King,* 471 U.S. at 475, 105 S.Ct. 2174; *Guardian Royal,* 815 S.W.2d at 226 (defendants may not be called into court based solely upon unilateral activity of another party or third person).

We find a recent case from this Court instructive on the question of when a nonresident entity's endorsement or gatekeeping activities can subject it to jurisdiction in Texas. In *Botter,* the plaintiffs sued the American Dental Association ("ADA") for "marketing" a dangerous amalgam

through its seal of approval in much the same way that MedCost here is accused of assisting in the procurement of an insurance program by approving its identification card for use in the MedCost network. 124 S.W.3d at 863. The Botters alleged that the ADA's endorsement and pamphlet advertising amalgam, its licensing of thousands of Texas dentist members who may not practice without such license, and its active governance of those members by an ethical code that would prevent them from warning about the amalgam constituted *"purposeful actions* in Texas that *caused this litigation." Id.* We held that specific jurisdiction did not exist because the Botters had not "sufficiently alleged that the ADA's extra-territorial conduct was focused on the plaintiff in Texas," and there were no purposeful contacts in Texas by the ADA. *Id.* at 864. Surely here, where the original plaintiffs were actually located in the Carolinas, and where the complaint is that MedCost allowed fraudulent insurers into the Carolinas, MedCost's actions are even more difficult to cast as having been focused on a plaintiff in Texas or as establishing purposeful contacts with Texas.[10] The dissent attempts to distinguish *Botter,* claiming that MedCost had a more substantial connection to Texas than did the ADA. Given that the ADA actively governed thousands of licensed dentists and pamphleted in favor of amalgam here,

while MedCost, without contracts with Texas entities, allowed them to distribute identification cards bearing a MedCost logo to their clientele, we disagree.

We conclude that the Receiver has not sufficiently alleged that MedCost, through its approval of the ID card to be used in the Carolinas, acted purposefully in Texas. Even if it is true that, by affirmatively approving the identification card for use by the Neal entities in the Carolinas, MedCost assisted in the procurement of the coverage, the Receiver has failed to sufficiently allege that that procurement occurred in Texas.

### Injury in Texas

■ The Receiver next argues that, even if MedCost had no direct contact with Texas, its conduct may subject it to personal jurisdiction because it committed a tort knowing that the resulting injury would be felt in Texas. The only harm that the Receiver claims is felt in Texas from MedCost's conduct is that the Texas Receiver must satisfy the unpaid claims from MedCost's network and that MedCost affirmatively caused those costs when it approved the Neal entities' access to its network.[11]

■ The Receiver is suing on behalf of North and South Carolina insureds who were harmed by the Neal entities' failure

10. We recognize that in *Botter,* the ADA was basically charged with having allowed dangerous amalgams into Texas, *see generally Botter v. American Dental Ass'n,* 124 S.W.3d 856 (Tex.App.-Austin 2003, no pet.), while here, MedCost is alleged to have allowed dangerous Texas residents into the Carolinas. We believe that this fact argues even more strongly against asserting personal jurisdiction over MedCost in Texas merely because the danger to the North and South Carolina health care recipients and providers originated here.

11. This is an odd concept of harm; the Receiver has to pay the Carolina claims because he stands in the shoes of the receivership entities and because he chose to litigate the claims in Texas. Thus, his argument is that, because MedCost allowed the Neal entities into the Carolinas and the receiver of the Neal entities must now at least partially make good on the insurance that they promised, MedCost has caused damage in Texas. Or, more succinctly: because MedCost did not stop the Neal entities from harming others, it is MedCost's fault that the Receiver standing in the shoes of the Neal entities must now pay for that harm.

to pay their claims in the Carolinas for health care provided in the Carolinas through MedCost's network. He now argues that, in pursuing their claims, he is suffering harm in Texas because he will have to pay the claims here. That is, because he chooses to litigate in Texas on behalf of the Carolina individuals, Texas will make him pay the claims on behalf of the Neal entities here. Had he chosen to litigate these claims in the Carolinas, he would be obligated to pay the claims there. Thus, despite his argument that MedCost took action for which it should be held liable, the connection to the forum state, if that connection is the harm to the Texas receiver of having to pay the claims here, occurs solely at the Receiver's discretion and is the result of his unilateral act. The unilateral acts of plaintiffs or third parties will not give Texas courts jurisdictions over nonresidents. *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174; *Guardian Royal,* 815 S.W.2d at 226.

Furthermore, the cases the Receiver cites do not apply in this context. *See Calder v. Jones,* 465 U.S. 783, 789, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); *Memorial Hosp. Sys. v. Fisher Ins. Agency,* 835 S.W.2d 645, 648 (Tex.App.-Houston [14th Dist.] 1992, no writ); *General Elec. Co. v. Brown & Ross Int'l Distribs., Inc.,* 804 S.W.2d 527, 533 (Tex.App.-Houston [1st Dist.] 1990, writ. denied).

In *Calder,* employees of the National Enquirer libeled a California resident by printing a story about her from their base in Florida. 465 U.S. at 789, 104 S.Ct. 1482. The United States Supreme Court ruled that the defendants had substantial contacts in California because they knew that the injury would occur in California, where their greatest magazine circulation was and where the plaintiff lived and worked. *Id.* at 789–90, 104 S.Ct. 1482. This case is unlike *Calder,* because MedCost did not commit a tort knowing that the resulting injury would be felt in Texas; and, in fact, the Receiver barely alleges that any injury was felt here. In *Calder,* the activities were purposefully directed *to* the forum state, California; here the harmful activities were directed *from* the forum state, Texas to the Carolinas. *See Calder,* 465 U.S. at 790, 104 S.Ct. 1482. None of the plaintiffs upon whose behalf the Receiver is suing MedCost are from Texas and none of the injuries for which he is suing occurred here.[12] Because the foreseeable victims in this case are the plaintiffs using the Carolina networks, none of whom resides in Texas, under *Calder,* specific jurisdiction is not proper here. *See National Indus. Sand Ass'n v. Hon. Jay Gibson, Judge,* 897 S.W.2d 769, 776 (Tex.1995) (under *Calder,* "[j]urisdiction based upon the effects of extra-territorial conduct within a particular forum is proper only when the extra-territorial conduct focuses upon a plaintiff residing in that forum").

In *Memorial Hospital System,* the plaintiff, a Texas hospital, phoned the nonresident defendant insurance company to inquire about insurance coverage for a patient. 835 S.W.2d at 648. The court held that the defendant's misrepresentation of coverage to the plaintiff constituted a tort committed with a foreseeable economic injury in Texas. *Id.* at 651. Here, the closest analogy the Receiver can make is that MedCost's approval of the identification card misled consumers, who were foreseeably harmed by relying on health

---

12. *See also Guardian Royal Exch. Assurance. Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 233 (Tex.1991) (where parties are "neither Texas consumers nor insureds, Texas'[s] interest in adjudicating the dispute (including its special interest in regulating insurance) is considerably diminished").

insurance for use in the MedCost network that ultimately proved to be worthless. Unlike the injured hospital in *Memorial Hospital*, neither the insureds nor the health care providers in this case resided in Texas, and their economic injury was not felt here. The fact that they assigned their claims to a Texas resident does not transform their injury in the Carolinas to a harm suffered in Texas.

In *General Electric*, the court held that although the nonresident defendants involved in a conspiracy to sell counterfeit General Electric parts had little physical contact with Texas, they should have known that their conduct would have an impact upon Texas and therefore the exercise of personal jurisdiction over them was proper. 804 S.W.2d at 533. The Receiver compares MedCost's contacts to those of the two individual defendants in *General Electric*, who knew their conduct would have effects in Texas because they intentionally pursued consumers here. *See id.* at 532–33 (defendants made individual visits to Texas, called customers and employees by telephone here, solicited and cultivated business relationships here, and sold counterfeit parts to Texas consumers, diverting General Electric customers to their own company). These *General Electric* defendants contracted with Texas companies and sold counterfeit parts directly to them. *Id.* Therefore, it was foreseeable that General Electric might sue in Texas, where the tortious acts had taken place and where it had been injured. *Id.* at 533. In contrast, MedCost did not contract with or injure any Texas residents.[13] Unlike

the *General Electric* defendants, MedCost did not come to Texas at all; rather, it allowed Texans—the Neal entities—to come to the Carolinas. The foreseeability analysis is therefore entirely distinct from that in *General Electric*. Where the acts giving rise to the suit did not arise in Texas and the defendant did not invoke the protections and benefits of Texas laws, "the fact that a tort is alleged to have been committed by a person out-of-state and that the tort may have had an effect in Texas is not sufficient for a court to exercise personal jurisdiction." *Morris*, 2005 WL 1034082, at *7, 2005 Tex.App. LEXIS 3404, at *14.

We hold that the Receiver has not sufficiently alleged that MedCost committed a tort knowing that the harm would be felt in Texas, or even that any harm related to this cause of action has occurred in Texas. Therefore MedCost defeated specific jurisdiction by presenting evidence that it was a nonresident in the hearing below. *See Siskind*, 642 S.W.2d at 438.

### General Jurisdiction

 An assertion of general jurisdiction compels a more demanding minimum-contacts analysis than an assertion of specific jurisdiction and requires a showing of substantial activities within the forum state. *Botter*, 124 S.W.3d at 862. General jurisdiction exists when the defendant's contacts with Texas "are continuous and systematic so that the forum may exercise personal jurisdiction over the defendant even if the cause of action did not arise

---

**13.** The district court's findings of fact do not include a finding that MedCost contracted directly with any Texas entity at the time of the *events giving rise to this suit*, nor do they list any Texas residents who were injured by MedCost. In characterizing MedCost's involvement as participation in a unitary fraudulent scheme headed by the Neal entities, the dissent imputes to MedCost all injuries that

the Neal entities caused in Texas or elsewhere. We do not believe it is appropriate to subject this Carolina resident to jurisdiction in a locale other than where it caused the injuries giving rise to the claims at issue. *See Guardian Royal*, 815 S.W.2d at 227 (for minimum contacts, we examine relationship between nonresident defendant, forum, and this litigation).

from or relate to activities conducted within the forum state." *Marchand,* 83 S.W.3d at 796 (citing *Guardian Royal,* 815 S.W.2d at 228); *CSR, Ltd.,* 925 S.W.2d at 595. To negate the exercise of general jurisdiction, the nonresident defendant must show it does not conduct substantial activities within the forum. *Marchand,* 83 S.W.3d at 797.

▮ The Receiver argues that Texas courts have general jurisdiction over Med-Cost because MedCost has actual continuing contractual relationships with various Texas entities and regularly does business with nine named insurance companies in Texas. In the trial court he presented printouts from MedCost's current website as evidence of these relationships. The site, however, reflects the state of affairs at the time of the hearing, not during the relevant time period, when the claims accrued. The relevant contacts are those up to the time of injury. *Botter,* 124 S.W.3d at 865.

Although it is true that a defendant bears the burden of negating the plaintiff's alleged bases of jurisdiction, the plaintiff must first show that what it alleges is actually a basis of jurisdiction. *Id.* (citing *Marchand,* 83 S.W.3d at 793). A subsequent website does not present the court with sufficient information to substantiate the allegations for proof of a pattern showing continuous and systematic activity at the time of the alleged injury. *See Botter,* 124 S.W.3d at 865. In *Botter,* "the information on the [current] ADA website [was] not probative in our jurisdictional analysis because it is not the same information that was on the website when the Botters' action accrued." 124 S.W.3d at 865. Information from the MedCost website existing at the time of the trial court hearing, not at the time the causes of action accrued, cannot serve as the basis of our jurisdiction. We thus conclude that the receiver

has failed to demonstrate that Texas courts may exercise general jurisdiction over MedCost in this suit.

## CONCLUSION

Because MedCost is not a resident of Texas and does not have minimum contacts with the state sufficient to support either specific or general jurisdiction in this case, we hold that the district court does not have personal jurisdiction over MedCost. We therefore reverse the judgment of the district court and render judgment dismissing the Receiver's claims.

Dissenting Opinion by Justice PATTERSON.

JAN P. PATTERSON, Justice, dissenting.

Because MedCost purposefully established ongoing relationships with fraudulent Texas insurance entities and directed actions toward Texas that were foreseeably harmful to Texas consumers, I would hold that the evidence in the record is legally and factually sufficient to support the trial court's denial of MedCost's special appearance and would, therefore, affirm the order.

## BACKGROUND

In 2002, the insurance commissioners of several states determined that Texas should be designated with the primary responsibility of litigating the claims against a multistate insurance scheme; Texas was considered the most appropriate forum because the primary actors in the scheme— Robert David Neal, American Benefit Plans (ABP), National Association of Working Americans (NAWA), and United Employers Voluntary Employees Beneficiary Association (UEVEBA)—were all based in the Fort Worth area. Robert Loiseau was appointed as the special depu-

ty receiver for several of the companies accused of insurance fraud. After the trial court entered a final judgment and permanent injunction against the receivership entities, finding that they had engaged in the unauthorized business of insurance and enjoining them from any further unauthorized practices, Loiseau brought suit against several insurance companies accused of facilitating the scheme and profiting from their involvement with the receivership entities. Pursuant to article 21.28 of the Texas Insurance Code, Loiseau's duties were to "take possession of the assets," liquidate, and distribute them among the claimants. *See* Tex. Ins.Code Ann. art. 21.28, §§ 2 ("General Procedures"), 8 ("Distribution of Assets") (West 1981 & Supp.2004–05).

As support for exercising personal jurisdiction over the named defendants, including MedCost, Loiseau relied upon section 101.001 of the Texas Insurance Code, setting forth the state's policy and statute's purpose:

(a) It is a state concern that many residents of this state hold insurance policies issued by persons or insurers who are not authorized to do insurance business in this state and who are not qualified as eligible surplus lines insurers under Article 1.14–2. These residents face often insurmountable obstacles in asserting legal rights under the policies in foreign forums under unfamiliar laws and rules of practice.

(b) It is the policy of this state to protect residents against acts by a person or insurer who is not authorized to do insurance business in this state by: (1) maintaining fair and honest insurance markets; (2) protecting the premium tax revenues of this

state; (3) protecting authorized persons and insurers, who are subject to strict regulation, from unfair competition by unauthorized persons and insurers; and (4) protecting against evasion of the insurance regulatory laws of this state.

(c) The purpose of this chapter is to subject certain insurers and persons to the jurisdiction of: (1) the commissioner and proceedings before the commissioner; and (2) the courts of this state in suits by or on behalf of the state or an insured or beneficiary under an insurance contract.

(d) It is also a concern that this state not become a safe harbor for persons or insurers engaged in the unauthorized business of insurance in this state, regardless of whether the insureds or other persons affected by the unauthorized business of insurance are residents of this state.

*Id.* § 101.001 (West Supp.2004–05).

Loiseau further alleged that the defendants "committed torts in the State of Texas and entered into contracts with one or more of the Receivership Defendants in the State of Texas." Loiseau alleged that the defendants profited from their involvement with ABP in the insurance scheme to the detriment of Texas and its residents because the receivership entities collected money (as premiums) from Texas residents and then passed those dollars along to the defendants, including MedCost. Based on this, Loiseau claimed the defendants were liable for negligence, gross negligence, breach of fiduciary duty, violation of Texas Insurance Code section 101.201, conspiracy, and negligent misrepresentation. Specifically against the Network Leasor Defendants, which included MedCost,[1] Loiseau alleged liability based

1. The defendants were categorized into five classes, depending on their alleged role in the

on an agreement to "market, sell, manage and administer the unlicensed and unauthorized health insurance programs," and the negligent failure to use due diligence in determining whether ABP and NAWA were properly licensed and financially sound and in discovering that Neal was the subject of several insurance complaints and indicted for federal tax fraud.

At the special appearance hearing, Loiseau testified and MedCost presented deposition testimony from its Vice President of Administration, Joel Groce, concerning this complex series of insurance relationships, transactions, and practices. Groce described MedCost as a preferred provider organization that contracts with a network of doctors and healthcare facilities in North and South Carolina to provide services at discounted rates to persons who present identification cards showing that they are entitled to the benefits of MedCost's network. He testified that MedCost leases this network to various insurance carriers—several of which are located in Texas—and, pursuant to that arrangement, the carriers provide their insureds with the necessary identification cards. In relation to each carrier, MedCost is responsible for approving the card's language before the cards can be distributed to the insureds. In determining whether to approve each card, as part of its due diligence MedCost considers an enumerated list of items: the checklist includes such concerns as making sure the payor (insurance carrier) is on MedCost's system and checking for any "red flags" regarding the payor.

Groce further testified that these insurance carriers become payors, or clients, of MedCost through a contract that MedCost has with American Healthcare Alliance (AHA), a Missouri company. The carriers pay a fee to AHA, and AHA pays a percentage of that fee to MedCost, on behalf of the carriers. After AHA brings the carriers to MedCost, MedCost leases its network to the carriers, and the carriers provide their insureds with cards allowing them to receive healthcare services at discounted rates from the providers in MedCost's network. Thus, MedCost acts as a "gatekeeper," determining which carriers it will form "strategic alliances" with by allowing them to take advantage of MedCost's network in exchange for a profit. Groce acknowledged that, when AHA brings a new carrier to MedCost, MedCost does not make further inquiry into that carrier's background before opening the gate, but instead takes as true AHA's representation that the carrier satisfies its requirements.

The majority accepts MedCost's contention that the only relationship we should consider in determining whether personal jurisdiction is proper is MedCost's contract with AHA. Loiseau argued, however—and the trial court concluded—that the profit-based relationships MedCost established with fraudulent Texas insurers through the AHA leasing arrangement should also be considered in the jurisdictional inquiry.

Groce testified that one carrier MedCost leased its network to, via the AHA contract, was UltraMed Choice Health Plan a/k/a National Benefits Alliance, an Oklahoma company. UltraMed in turn contracted with Texas-based ABP and its principal, Robert Neal, to handle paying the various networks it leased, including MedCost. As with all carriers with which MedCost had a payor arrangement, MedCost used its enumerated checklist to ap-

scheme, as follows: (1) Neal Defendants, (2) Third Party Administrators and PEOs, (3) Network Leasors, (4) Tim Tierney, and (5) General Agents and Managing General Agents.

prove the identification card that UltraMed issued to its insureds. An exhibit showed that all of the boxes were checked on UltraMed's form, demonstrating that MedCost had conducted a due-diligence review and determined there were no "red flags" concerning UltraMed. MedCost then approved UltraMed's card with MedCost's logo on it, "MedCost Preferred" printed at the bottom, and "UltraMed Choice Health Plan, Sponsored by the National Association of Working Americans [NAWA]" printed at the top. Groce claimed that MedCost had "no knowledge" of who NAWA was, but he admitted that MedCost determined "everything checked out" and approved the card for use.

After activating UltraMed as a payor in September 2001 and approving the UltraMed/NAWA card in October 2001, MedCost terminated UltraMed's access to its network in December 2002 because UltraMed had not paid its monthly leasing fees from September through December. UltraMed then paid its balance, and MedCost reactivated UltraMed in January 2002, using the same UltraMed/NAWA card as previously approved. UltraMed again failed to pay its fees for January through March, and on March 15, 2002, MedCost sent an e-mail to AHA stating that it was terminating its relations with UltraMed. The e-mail discussed UltraMed's connection with ABP and Neal, stating that Neal had been "indicted by the state of TX for selling insurance without a license and some other offenses," and that UltraMed is "a coalition of employers and that should have been our first red flag!" Groce testified that "a coalition of employers are very suspect. They're legal in some states and not legal in others. . . . [T]his is a danger zone and this one went bad."

Groce also affirmed that MedCost's relationships in the insurance industry are not confined to North and South Carolina. According to Groce, there are "multiple groups that use our network across the United States." MedCost has payor agreements with several Texas carriers, so that those carriers can benefit from MedCost's network for a monthly lease fee. This allows the insureds of the Texas carriers to receive services from MedCost's network of providers in the Carolinas.

At the hearing, Loiseau contended that MedCost's relations with the fraudulent insurance network established minimum contacts with Texas. The majority mischaracterizes Loiseau's position by claiming that Loiseau based his jurisdictional argument on the fact that MedCost allowed Texas entities to harm Carolina residents. While MedCost may have done so, these are not the actions that Loiseau focused on as a basis for bringing MedCost into a Texas court.

Instead, Loiseau emphasized MedCost's connection with the Texas-based NAWA, Neal, and ABP—via the UltraMed account—as support for the exercise of personal jurisdiction over MedCost. Loiseau explained that the Texas-based NAWA used PPOs, including MedCost, "as a marketing device" to offer discounted rates, "entic[ing] people to buy this . . . relatively cheap insurance. That's how they got the working people, who bear the brunt of the fraud perpetrated by the participants in this program." In turn, MedCost profited from its dealings with NAWA, and MedCost was "paid ultimately from commingled funds, some of which came out of Texas." Loiseau testified that MedCost's approval of UltraMed's identification card, which contained MedCost's name and logo along with NAWA's, evidences a relationship between MedCost and NAWA: pursuant to this arrangement, NAWA collected money from Texas residents and passed it along to MedCost through the UltraMed

account. Hence, MedCost "either knew they were doing business with NAWA, which was a Texas-based company, or they deliberately closed their eyes to it." Loiseau offered proof that MedCost knew it was dealing with a Texas company based on the facts that (1) at the time MedCost approved the UltraMed/NAWA card, NAWA was a Texas company, NAWA was operating without a license, and Neal had been indicted for tax and insurance fraud, all of which were documented in public records, and (2) MedCost terminated its relationship with UltraMed and NAWA when the State of Texas took action to shut down the scheme.

Loiseau also testified that MedCost had connections with UEVEBA, another Texas-based receivership entity. As support, he entered into evidence a contract displaying UEVEBA's name at the top and showing that MedCost leased its network of providers to an employer in UEVEBA's group, Ideal Solutions, Inc.

Ultimately, Loiseau argued, MedCost's participation in this scheme allowed Neal, NAWA, ABP, and UEVEBA to perpetrate fraud on Texas consumers because it was "a significant selling point" for these Texas entities to be able to market themselves as having "nationwide" PPO coverage. Thus—contrary to the majority's assertion that Loiseau's argument was simply "because MedCost's contracts facilitated the Texas-based entities' providing illegal health insurance to users of MedCost's network in the Carolinas"—Loiseau demonstrated that MedCost purposefully established ongoing relations with Texas entities and that MedCost knew or should have known that the activities it engaged in with those entities were fraudulent. Based on this, the trial court denied MedCost's special appearance.

## ANALYSIS

By determining that jurisdiction does not exist over MedCost because its approval of the UltraMed card was not "an act taken in Texas," the majority overlooks the well-established principle that personal jurisdiction exists when a nonresident defendant's activities are "purposefully directed at" the forum, regardless of where they physically occurred. *See, e.g., Asahi Metal Indus. Co. v. Superior Ct. of Cal.,* 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (connection between defendant and forum "must come about by an action of the defendant purposefully directed toward the forum State") (emphasis omitted); *Zac Smith & Co. v. Otis Elevator Co.,* 734 S.W.2d 662, 665–66 (Tex.1987) (although defendant had "no physical ties to Texas," and contract was executed in Florida and Louisiana, specific jurisdiction existed over defendant because he purposefully directed actions at Texas by entering contract that contemplated profits from Texas). The Supreme Court has expressly rejected the notion that a defendant is required to have some physical presence in the forum state to establish minimum contacts, especially given that "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

Rather, the inquiry turns on whether the nonresident defendant purposefully availed itself of the privileges and benefits of conducting business in this state, such that the defendant could reasonably foresee being called into a Texas court to litigate. *Id.* at 474, 105 S.Ct. 2174. This requirement is satisfied if the contacts are not random or fortuitous but the defendant "has created 'continuing obligations' between [it]self and residents of the forum." *Id.* at 475–76, 105 S.Ct. 2174.

MedCost purposefully availed itself of the benefits and privileges of conducting business in Texas by establishing "continuing obligations" between itself and the Texas entities that played primary roles in the insurance scheme, such as NAWA, ABP, Neal, and UEVEBA. *See id.* at 474, 476, 105 S.Ct. 2174 (jurisdiction appropriate when nonresident defendant creates continuing obligations with forum residents and "purposefully derive[s] benefit" from its interstate activities). MedCost acted as a gatekeeper by making the affirmative decision to permit these Texas entities—which MedCost knew or should have known[2] were selling fraudulent insurance policies to Texas consumers—to access its provider network. This network leasing arrangement benefited the Texas entities by enhancing their marketability and, in turn, benefited MedCost by participating in the network and allowing it to collect monthly fees from every entity that leased its network. MedCost's affirmative, checklist-based approval of the UltraMed identification card, which displayed MedCost's logo and stated that the plan was sponsored by NAWA, further demonstrates that MedCost's contacts were not random or fortuitous, but were instead purposefully directed toward Texas. Additionally, MedCost's actions satisfy the "purposeful" requirement because it was foreseeable that MedCost's ongoing involvement with these Texas entities would cause harm in Texas.[3]

Even if the nonresident defendant had no physical presence in Texas, it is generally appropriate to exercise specific jurisdiction over a nonresident who directs foreseeably harmful actions at the forum state—such as participating in a fraudulent scheme detrimental to Texas consumers—because the defendant has purposefully availed itself and, therefore, should anticipate being called to Texas to answer for those actions. *See, e.g., Calder v. Jones,* 465 U.S. 783, 789, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (tort committed in Florida that caused harm in California supported California's jurisdiction over Florida defendant); *Siskind v. Villa Found. for Educ., Inc.,* 642 S.W.2d 434, 437 (Tex.1982) (Arizona defendant's misrepresentations and deceptive trade practices that harmed Texas residents supported specific jurisdiction in Texas); *Ennis v. Loiseau,* No. 03-04-00748-CV,

---

2. Having weighed the credibility of both parties, the trial court found that MedCost failed to act with due diligence concerning the legitimacy of the Texas entities, including ABP and NAWA. This finding should not be disturbed because it is supported by sufficient evidence, including Groce's testimony that MedCost relied solely on AHA's representations and the public records demonstrating that Neal had been investigated and indicted for insurance fraud. MedCost either had affirmative knowledge of the fraud involved, or turned a blind eye to it by failing to act with due diligence.

3. A reviewing court should be mindful that a special appearance is not the appropriate stage to make a determination on liability; issues of ultimate liability are separate inquiries and are properly reserved for trial on the merits. *Walker Ins. Servs. v. Bottle Rock Pow-*

*er Corp.,* 108 S.W.3d 538, 549 (Tex.App.-Houston [14th Dist.] 2003, no pet.); *French v. Glorioso,* 94 S.W.3d 739, 746 (Tex.App.-San Antonio 2002, no pet.); *Ross F. Meriwether & Assoc., Inc. v. Aulbach,* 686 S.W.2d 730, 732 (Tex.App.-San Antonio 1985, no writ). Facts suggesting the nonresident defendant engaged in tortious activity that foreseeably caused harm in Texas must be considered, however, in order to determine whether the defendant should have anticipated being haled into a Texas court. *See Siskind v. Villa Found. for Educ., Inc.,* 642 S.W.2d 434, 437 (Tex.1982) (facts supporting allegations of defendant's deceptive trade practices were relevant to jurisdictional inquiry); *French,* 94 S.W.3d at 743–44 (jurisdictional determination only requires sufficient evidence to support implied findings that suggest, but do not ultimately prove, liability).

2005 WL 1034092, at *8, 2005 Tex.App. LEXIS 3412, at *30 (Tex.App.-Austin May 5, 2005, no pet. h.) (nonresident's participation in fraudulent insurance scheme that harmed Texas consumers supported specific jurisdiction); *LeBlanc v. Kyle,* 28 S.W.3d 99, 104 (Tex.App.-Texarkana 2000, pet. denied) (specific jurisdiction in Texas appropriate over French manufacturer based on contract with Vermont company to distribute faulty water heaters to "the fifty states," which included Texas); *Memorial Hosp. Sys. v. Fisher Ins. Agency, Inc.,* 835 S.W.2d 645, 650 (Tex.App.-Houston [14th Dist.] 1992, no writ) (nonresident defendant's single misrepresentation, made to Texas entity over telephone from out-of-state, supported specific jurisdiction in Texas); *General Elec. v. Brown & Ross Int'l,* 804 S.W.2d 527, 532–33 (Tex.App.-Houston [1st Dist.] 1990, writ denied) (New York defendant's participation in conspiracy that would foreseeably defraud Texas consumers supported Texas's specific jurisdiction, even though defendant had never been present in Texas).

Although the majority notes that foreseeability is an important component of the jurisdictional inquiry, it overlooks the fact that MedCost's actions were foreseeably harmful to Texas residents, asserting instead that MedCost's actions "jeopardized only residents and consumers of the Carolinas." To reach this conclusion, the majority views MedCost's involvement with the Texas-based entities as a one-way street. But MedCost operated as the gatekeeper. Not only did MedCost open the gate and allow the fraudulent Texas insurers into its network, MedCost in turn profited from this arrangement. Moreover, this arrangement was detrimental to Texas consumers; by advertising themselves as "nationwide," the fraudulent Texas insurers were able to defraud many Texas consumers into purchasing the "bogus" insurance products, and the money collected from these Texas victims was used to pay MedCost. Because MedCost's actions facilitated the fraud perpetrated on Texas residents, and MedCost profited from that fraud, MedCost is subject to the jurisdiction of Texas courts. MedCost should have anticipated this when it approved the identification card, which was a specific, purposeful action taken by MedCost with knowledge that it was establishing an ongoing relationship with a fraudulent Texas insurer (NAWA).

The Texas Legislature has articulated a state policy to protect its residents from the harm caused by unauthorized insurance practices and to prevent Texas from becoming a "safe harbor for persons or insurers engaged in the unauthorized business of insurance in this state, regardless of whether the insureds or other persons affected by the unauthorized business of insurance are residents of this state." Tex. Ins.Code Ann. § 101.001. This state policy, along with the well-established jurisprudence that a nonresident defendant should anticipate being haled into Texas when it participates in activities that are foreseeably harmful to Texas residents, supports the exercise of specific jurisdiction over MedCost. MedCost could reasonably foresee that it would have to defend its actions in Texas based on section 101.201 of the insurance code, which states that a "person who in any manner assisted directly or indirectly in the procurement of [an unauthorized insurance] contract is liable to the insured for the full amount of a claim or loss under the terms of the contract if the unauthorized insurer fails to pay the claim or loss." *Id.* § 101.201(a) (West Supp.2004–05).

MedCost's actions were not confined to the Carolinas. Rather, MedCost established, through its many network leases, ongoing relationships with a web of enti-

ties involved in a multistate insurance scheme. The majority notes that no finding of fact stated that MedCost had a direct contract with any Texas entity. In findings of fact 10, 14–15, and 26, the trial judge found that, pursuant to its contract with AHA, MedCost was "involved in the ABP scheme" and sold the UltraMed plan, which was an ABP product, and that MedCost profited from this plan, which was administered by PAR and sponsored by NAWA. MedCost had purposeful, ongoing relationships with the fraudulent Texas insurers, and it should not be permitted to benefit from clever structuring, given its participation in and knowledge of the network that operated to the detriment of Texas consumers. That MedCost's relationships with the Texas entities were established through third-party entities does not provide it immunity from suit in Texas, where hundreds of thousands of dollars have been lost. "[A] truly interstate business may not shield itself from suit by a careful, but formalistic structuring of its business dealings." *Siskind*, 642 S.W.2d at 437. MedCost's participation in the insurance scheme, therefore, amounts to "minimum contacts" purposefully directed at Texas.

If a nonresident defendant has purposely established minimum contacts with the forum state, then the second prong of the specific jurisdiction inquiry asks whether those specific contacts gave rise to, or are connected with, the underlying claims. *Schlobohm v. Schapiro*, 784 S.W.2d 355, 358 (Tex.1990). Here, the claims that were assigned to the receiver in the underlying suit are substantially connected to the purposeful contacts MedCost established with Texas through its relationships with NAWA, ABP, Neal, and UEVEBA, thereby satisfying the second prong of the specific jurisdiction inquiry.

*Botter v. American Dental Association*, the case primarily relied on by MedCost, is distinguishable. *See* 124 S.W.3d 856 (Tex. App.-Austin 2003, no pet.). Contrary to the facts of *Botter*, here there was a substantial connection between MedCost's actions, the State of Texas, and the claims at issue in the underlying suit, based on MedCost's continuing obligations to and its participation with the regulated Texas entities in the networked scheme that facilitated the perpetration of fraud on Texas consumers, from which MedCost profited. *Botter*, therefore, does not support MedCost's claim that Texas lacks specific jurisdiction over it.

"Once it has been decided that a defendant purposefully established minimum contacts within the forum state, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.' " *Burger King Corp.*, 471 U.S. at 476, 105 S.Ct. 2174. These factors include: (1) the burden on the defendant, (2) the interests of the forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 228 (Tex.1991) (citations omitted); *see also Asahi Metal Indus.*, 480 U.S. at 113, 107 S.Ct. 1026 (discussing factors to consider).

A nonresident defendant who has established minimum contacts with the forum, yet seeks to avoid jurisdiction based on these factors, must present a "compelling case" that the traditional notions of fair play and substantial justice would be violated by subjecting him to litigation in the

forum; "the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed." *Burger King Corp.*, 471 U.S. at 474, 477, 105 S.Ct. 2174. Moreover, "[b]ecause the minimum contacts analysis now encompasses so many considerations of fairness, it has become less likely that the exercise of jurisdiction will fail a fair play analysis." *Schlobohm*, 784 S.W.2d at 357–58.

MedCost claims that, even if minimum contacts are established, it should not be subjected to jurisdiction because it and the witnesses with relevant knowledge are located in North and South Carolina, the claims against MedCost originally belonged to citizens of the Carolinas, and Texas has no greater interest in litigating these claims than do North and South Carolina. MedCost does not present any evidence beyond the conclusory statement in Groce's affidavit that litigating in Texas would be an "extreme burden." This is not a "compelling case" against the reasonableness of exercising personal jurisdiction over MedCost.

Travel required by a corporate defendant and its employee witnesses to the forum does not constitute a substantial burden or undue hardship as to violate the Due Process Clause if the defendant has purposefully availed itself of that forum. Distance alone is not sufficient to defeat jurisdiction, given that "modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." *Burger King Corp.*, 471 U.S. at 474, 105 S.Ct. 2174; *see also Guardian Royal*, 815 S.W.2d at 231. In a receivership action involving multi-state transactions and relationships such as this, where parties and witnesses from across the country are involved in the same suit, it is unavoidable that some will

have to travel. MedCost, therefore, has not satisfied its threshold burden of showing that it would be unfairly burdensome to require it to litigate in Texas.

While it is true that the specific claims against MedCost belonged to residents of North and South Carolina before they were assigned to the Special Receiver, this does not support MedCost's argument. First, it is significant that many Texas consumers were harmed by the fraud that MedCost knowingly facilitated through its involvement with the Texas-based entities. Although these Texas consumers did not name MedCost in their underlying claims, MedCost played a role in the fraud perpetrated by the defendants that were named by the Texas victims; MedCost must answer for the harm it caused in this state.

Moreover, all of the underlying claims—including those brought by Carolina residents against MedCost—have been assigned to Loiseau and are being litigated in Texas. A factor to be considered in the due process analysis is the plaintiffs' interest in obtaining effective relief. Here, the victims determined that their most effective method of obtaining relief was to assign their claims to the receiver in Texas, rather than to bring individual suits against MedCost elsewhere. It would not be practical or efficient—from an individual or a judicial perspective—for the hundreds of plaintiffs to litigate these claims separately across the country. Loiseau testified at the special appearance hearing that it was not economically feasible for the receiver to sue each of the defendants in their respective home states. Hence, the plaintiffs' interests are served by maintaining this suit in Texas.

Further, the nature of the underlying litigation supports jurisdiction in Texas because it involves insurance, a highly regulated industry. *See Burstein v. State Bar of Cal.*, 693 F.2d 511, 522 (5th Cir.1982)

(fact that insurance is highly regulated industry was factor to consider in denying special appearance); *Guardian Royal,* 815 S.W.2d at 229 & n. 8 ("[A] state's regulatory interest in a certain area or activity such as insurance is an important consideration in deciding whether the exercise of jurisdiction is reasonable and [ ] a state's regulatory interest may establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required."). Insurance fraud is a nationwide problem that all states have a shared interest in efficiently resolving, which is why the multistate group of commissioners took collective action in this case. These considerations distinguish the instant case from the majority of special appearance cases, which typically concern the private business dealings or sales transactions between individual companies and, unlike the insurance industry, do not impact the general public. It therefore serves the interest of the interstate judicial system in protecting the state's citizens, as well as the shared interest of the several states, to bring the claims against MedCost in Texas.

Finally, Texas's interest in litigating here is substantial. Several of the primary actors in this insurance scheme were based in Texas, including NAWA, ABP, Neal, and UEVEBA. MedCost established connections with these entities and facilitated their ability to defraud Texas consumers. As MedCost's vice president testified, MedCost formed "strategic alliances" with insurance carriers in many states, including several Texas companies. Texas has statutorily recognized that, when the unauthorized practice of insurance has occurred, its "residents face often insurmountable obstacles in asserting legal rights under the policies in foreign forums under unfamiliar laws and rules of practice." Tex. Ins.Code Ann. § 101.001(a). Based on MedCost's acknowledged connec-

tions with the insurance industry in Texas, no due process violation results from recognizing Texas's interest in subjecting MedCost to jurisdiction in this state.

Because it is not unduly burdensome to subject MedCost to the jurisdiction of a Texas court, and because the interests of Texas, the plaintiffs, and the several states are all served by doing so, the exercise of personal jurisdiction over MedCost comports with the traditional notions of fair play and substantial justice.

Because the evidence supports the exercise of specific jurisdiction over MedCost, I would affirm the trial court's order.

