# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-14-00493-CV

**Industrial Product Formulators of America, Inc., Appellant**

**v.**

**Rockford Business Interiors, Inc., Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT NO. D-1-GN-12-003380, HONORABLE TIM SULAK, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Industrial Product Formulators of America, Inc. (Formulators) appeals a district court order denying a special appearance[1] through which it had challenged personal jurisdiction in a suit brought against it by McCoy-Rockford, Inc. (Rockford) (incorrectly identified in the caption as "Rockford Business Interiors, Inc.").[2]  We will affirm.

Rockford is an Austin-based Texas corporation that provides commercial interior products and services, including furnishing and installing flooring for businesses.  In connection with its work on a project in Austin in 2010 and 2011, Rockford purchased quantities of a floor adhesive known as Aquaflex from the product's manufacturer, Formulators, a California corporation whose

---

[1] *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(7).

[2] McCoy-Rockford, Inc. (Rockford) was formed in late December 2010 through the merger of Rockford Business Interiors, Inc. (the entity identified in the caption as appellee) and McCoy, a general partnership.  As will become apparent shortly, some of the alleged events underlying Rockford's suit predated the merger and involved the former Rockford Business Interiors, Inc. entity.  However, as the surviving entity of the merger, Rockford succeeded to Rockford Business Interiors, Inc.'s rights, title, and interests.  *See* Tex. Bus. Orgs. Code § 10.008.  *See also infra* pp. 17–18.

sole office is also located in that state. The product failed to perform to Rockford's satisfaction, and Rockford subsequently filed suit against Formulators in Travis County district court, seeking damages under contract and warranty theories.

A nonresident defendant like Formulators[3] is subject to the personal jurisdiction of Texas courts if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction does not violate federal and state constitutional due-process guarantees,[4] a limitation that also defines the outer reaches of the long-arm statute itself.[5] "Personal jurisdiction is consistent with due process 'when the nonresident defendant has established minimum contacts with the forum state, and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice.'"[6] A defendant establishes "minimum contacts" when it "purposefully avails" itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.[7] "[T]he acts relied upon must be 'purposeful,'" not "'random,

---

[3] *See* Tex. Civ. Prac. & Rem. Code § 17.041 ("nonresident" under Texas long-arm statute includes a foreign corporation).

[4] *Kelly v. General Interior Constr., Inc.*, 301 S.W.3d 653, 657 (Tex. 2010) (citing *Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (Tex. 1990)).

[5] *Id.* ("The broad 'doing business' language in Texas's long-arm statute allows the trial court's jurisdiction to 'reach as far as the federal constitutional requirements of due process will allow.'" (quoting *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007)); *see* Tex. Civ. Prac. & Rem. Code § 17.042 ("In addition to other acts that may constitute doing business, a nonresident does business in this state if the nonresident: (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state . . . .").

[6] *Kelly*, 301 S.W.3d at 657 (quoting *Moki Mac*, 221 S.W.3d at 575 (internal quotations omitted) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945))).

[7] *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005) (citing *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

2

isolated, or fortuitous'";[8] the nonresident defendant must "seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction";[9] and "it is only the defendant's contacts with the forum that count," not the "'unilateral activity of another party or a third person.'"[10] Underlying these principles is implied consent—"that by invoking the benefits and protections of a forum's laws," as opposed to "structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction," a nonresident "consents to suit there."[11]

To support the district court's assertion of personal jurisdiction over Formulators, Rockford pleaded and, in response to Formulator's special appearance, presented evidence concerning the parties' dealings relating to the purchase and sale of Aquaflex and alleged performance issues, with emphasis on acts by Formulators that occurred in Texas.[12] This evidence included the affidavit and live testimony of Christi Wade, an account executive with Rockford. Wade indicated that the first contact between the two companies occurred in July or August 2010, when Formulators CEO Benny Dickens telephoned her to solicit Rockford's purchase of Aquaflex for use in its Austin project. During that conversation, according to Wade, Dickens assured her that high levels of moisture present in the concrete slab at the project site—a potential challenge to the functionality of flooring adhesives—"would not be a problem."

---

[8] *Id*. at 785 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)).

[9] *Id.*

[10] *Id*. (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

[11] *Id*. (citing *Burger King*, 471 U.S. at 473; *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *American Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 808 (Tex. 2002)).

[12] *See generally Kelly*, 301 S.W.3d at 658–59 (explaining the burden-shifting framework that governs judicial determination of challenges to personal jurisdiction).

Following this initial exchange, according to Wade, she and Dickens had several other communications leading up to Rockford's decision to purchase Aquaflex. These included, Wade claimed, Dickens's shipment of a sample of Aquaflex to Rockford in Austin at no charge. Around the same time, Wade added, Dickens sent her an email, also in evidence, touting Aquaflex as "the first water-proof adhesive to solve moisture related adhesive bond failures once and for all." Dickens attached to his email pricing information and a two-page "Product Information" sheet containing additional representations regarding Aquaflex's properties and performance. The document also set forth a five-year limited warranty against defects in materials and workmanship. Terms of the warranty included a limitation of remedies to "the replacement of finished flooring materials, labor and adhesive in affected areas only and as determined by Formulators."

Wade further testified that Dickens offered to send an individual to Rockford's Austin project site to assist it in its initial application of Aquaflex. He also invited her to send him a sample of the tile that Rockford planned to use in its Austin project so he could perform tests to ensure compatibility with Aquaflex. She did so, and claimed that Dickens thereafter made representations about the test results that, in combination with his other communications, prompted Rockford to purchase Aquaflex.

According to Wade, Rockford ultimately made three purchases of Aquaflex for use on the Austin project. The transactions were memorialized in three purchase orders on Rockford letterhead dated October 19, 2010; December 13, 2010; and February 10, 2011. In connection with each transaction, Rockford issued a check corresponding to the amount of Aquaflex it was purchasing (which totaled approximately $62,000), plus the cost of shipping each purchase to Texas. Upon receipt of each payment, Formulators shipped the Aquaflex to Rockford in Austin, with an invoice that served as a receipt.

4

There was also evidence that Formulators's contacts with Texas continued once Rockford began purchasing the Aquaflex. Following Rockford's first purchase, according to Wade, she requested that Dickens, per his earlier offer, dispatch someone to the job site to ensure that Rockford is "prepping the floor to your standards" in advance of using Aquaflex. Dickens agreed to do so, and Formulators retained a contractor from Austin, Thomas Hintz, and sent him to the Austin project site to give such guidance to Rockford. Subsequently, in May 2011, after Rockford began complaining of product failure, Formulators, through Dickens, similarly retained another Austin-based contractor, Mike Hart, to inspect the project site and help remedy any problems. Thereafter, according to Wade, Formulators sent Hart to the Austin project site for a second time. As the problems continued to defy resolution, it is undisputed that Dickens himself traveled to Austin in July 2011 to view the project. He was accompanied by a contractor from New Hampshire, William Lepito, whom Dickens had directed to come to the site "to do an official forensic investigation" on the flooring materials.

In addition to proof regarding Formulators's immediate dealings with Rockford, Rockford relied on evidence that Formulators had made sales in Texas to other customers.[13] This evidence reflected that between 2008 and 2012, for example, Formulators made sales to a total of eleven Texas customers, with at least one per year, garnering total revenues in excess of $128,000.

The chief thrust of Formulators's challenge to personal jurisdiction, at least as it relates to this appeal, was that the extent of the company's contacts with Texas closely resembled the circumstances addressed in the Texas Supreme Court's seminal opinion *Michiana Easy Livin'*

---

[13] *See Moki Mac*, 221 S.W.3d at 577 ("In determining whether the defendant purposefully directed action toward Texas, we may look to conduct beyond the particular business transaction at issue: '[a]dditional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State.'") (quoting *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 112 (1987)).

*Country, Inc. v. Holten*.[14]  In that case, a Texas resident had telephoned an Indiana-based RV dealer (Michiana) that had no Texas presence and did not advertise here, ordered an RV that was constructed and equipped outside Texas, sent payment in advance to Indiana, requested shipment to Texas at the resident's own expense, and then later attempted to sue Michiana in Texas for misrepresentations it allegedly made during the phone call.[15]  The Texas Supreme Court held that none of these facts sufficed as purposeful availment by Michiana to the Texas forum.  It relied on precedents emphasizing that a single or "isolated" unsolicited purchase of a product made from the forum state, or the ensuing shipment of the product there, could not alone establish jurisdiction because the contact, as such, had resulted from the unilateral actions of the purchaser rather than those of the seller.[16]  Similarly, the court reiterated that "a single contract with a Texas resident [cannot] automatically establish jurisdiction"[17] and that the real issue was the extent to which the contract contemplated or entailed jurisdictionally significant *contacts* with the forum state.[18]  Such contacts were lacking, the supreme court observed, where "Holten [the Texas resident] paid for the RV in advance and could not have planned on taking it to Indiana regularly for service"—in short,

---

[14]  168 S.W.3d 777.

[15]  *See id*. at 781, 784.

[16]  *See id*. at 786–87, 788 (citing *Woodson*, 444 U.S. at 295; *CMMC v. Salinas*, 929 S.W.2d 435, 436, 439 (Tex. 1996)).

[17]  *Id*. at 786 (citing *Burger King*, 471 U.S. at 475 n.18).

[18]  *Id*. at 787 ("It is true that in some circumstances a single *contract* may meet the purposeful-availment standard, but not when it involves a single *contact* taking place outside the forum state.  A long-term franchise agreement may establish minimum contacts because, though it stems from a single contract, it involves many contacts over a long period of time.  Similarly, a life-insurance policy may stem from a single contract, but necessarily involves a series of contacts until death does the parties part.") (citing *Burger King*, 471 U.S. at 480; *McGee v. International Life Ins. Co.*, 355 U.S. 220, 223 (1957)).

6

"[e]verything Michiana wanted out of the contract it had in hand."[19]  Under those circumstances, the court concluded, "it is hard to imagine what possible benefits and protection Michiana enjoyed from Texas law" or even "how Michiana would have conducted its activities any differently if Texas had no law at all."[20]

Formulators emphasized that, similar to Holten, Rockford had paid for the product in advance (which, Dickens testified, is Formulators's standard practice) and had requested shipment to Texas at Rockford's own expense.  Formulators also disputed some of the facts to which Rockford's Wade had testified.  According to Dickens, it was Wade who had first initiated contact with him regarding her company's purchase of Aquaflex, not the other way around.  Dickens further sought to minimize the extent of Formulators's sales to Rockford, characterizing them as but a single transaction involving three shipments rather than three separate transactions.  Beyond these discrepancies, however, the evidence was largely undisputed, and several material facts were even conceded by Dickens.  For example, Dickens acknowledged that Formulators had retained an Austin-based independent contractor, Hintz, to demonstrate how Rockford should prepare its floor surface in advance of using Aquaflex; later retained another Austin-based contractor, Hart, to address Rockford's claims of performance issues; sent yet a third contractor, Lepito, to Austin to conduct a forensic analysis of the alleged failures; and that he had also traveled to Austin himself to personally address these concerns.  These actions, Dickens explained, had been undertaken "as a customer service" to Rockford and as "part of honoring [Formulators's] warranty."  He also

---

[19]  *Id.*

[20]  *Id.*

acknowledged that by selling to Rockford and other Texas residents, he had hoped to gain "further referrals" that would afford Formulators more "opportunity" to "sell our Aquaflex product" in Texas.

After hearing evidence, the district court took the matter under advisement and thereafter signed an order denying Formulators's special appearance. The court subsequently made findings of fact and conclusions of law. Among other facts, the district court found that (1) from 2008 through 2012, "Formulators routinely did business in Texas"; (2) during this same period "Mr. Dickens personally traveled to Texas at least twice to attend to customer accounts"; (3) "Formulators made three significant sales of Aquaflex to Rockford, in Texas"; (4) in connection with the sales to Rockford "Formulators hired three individuals—two of whom were Texas residents—to help Formulators implement its agreement with Rockford"; (5) "Formulators solicited Rockford in Texas"; (6) Dickens first called Wade in Texas; (7) Formulators "sent Rockford information about Aquaflex, including product information, pricing, and warranty information"; (8) "Formulators sold Aquaflex to Rockford in Texas with a five-year warranty"; and (9) "Formulators admittedly hired" the three contractors "to visit the Project site [in Texas] as part of its customer service and in an effort to honor its warranty agreement with Rockford." These facts, the court concluded, sufficed as "minimum contacts" that would support "specific jurisdiction"—i.e., that each of Rockford's claims arises from or is related to the same contacts or acts through which Formulators purposefully availed itself of conducting activities in Texas[21]—as contrasted with the much more extensive showing required for "general jurisdiction."[22]

---

[21] *See Kelly*, 301 S.W.3d at 658.

[22] *See Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014) ("'[a] court may assert general jurisdiction over foreign . . . corporations . . . when their affiliations with the State are so "continuous and systematic" as to render them essentially at home in the forum State'") (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011)).

8

On appeal, Formulators continues its efforts to portray this case as essentially a reprise of *Michiana*: an unsolicited, one-time sale of a product neither preceded by any purposeful availment of the Texas forum, nor entailing any thereafter.[23] Formulators insists that it "neither solicits nor advertises or markets its products in Texas," although it acknowledges that the evidence regarding "who solicited who[m]" in the present case "is disputed." It similarly asserts that "[e]vidence of attempts to establish ongoing relationships with and to serve a Texas market is wholly lacking," that the "trial court misrepresents" that Dickens visited Texas "'to attend to customer accounts' in general," and that the parties entered into only "a single transaction," not three.

These assertions are inconsistent with the district court's fact findings, which are to the effect that Formulators had advertised for and solicited business from Rockford in Texas and had entered into ongoing relationships with Rockford and others that contemplated "customer service" and "honor[ing] of its warranty" there. To the extent Formulators is seeking to challenge the legal sufficiency of the evidence supporting these findings, we conclude that the evidence, previously

---

[23] Formulators also devotes much of its briefing to negating *general* jurisdiction, but that theory, again, was not the basis of the district court's order. We focus instead on Formulators's arguments that are germane to specific jurisdiction. We similarly do not unnecessarily belabor instances where Formulators appears to invoke inapposite principles governing general jurisdiction to support its conclusions regarding specific jurisdiction. *See* Tex. R. App. P. 47.1.

summarized, abundantly supports the district court's resolution of any factual discrepancies.[24]  In

fact, many of the material facts were undisputed, if not wholly conceded by Formulators's Dickens.

As for the legal effect of these underlying facts as they bear upon personal

jurisdiction,[25] the district court's findings that Formulators advertised for and solicited Rockford's

purchase of Aquaflex distinguishes this case from *Michiana* and brings it more closely in line with

cases like *Moki Mac River Expeditions v. Drugg*.[26]  In that case, the Texas Supreme Court held that

a nonresident guide service (Moki Mac) had purposefully availed itself of the Texas forum by

---

[24]  When reviewing a challenge to the legal sufficiency of the evidence supporting a fact finding, we view the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it.  *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005).  We must credit favorable evidence if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not.  *Id.* at 827.  "'"No evidence" points must, and may only, be sustained when the record discloses one of the following situations:  (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact.'"  *Id.* at 810 (quoting Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960)); *see also Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997).  More than a scintilla of evidence exists to support a finding when the evidence would allow reasonable and fair-minded people to differ in their conclusions.  *Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338, 347 (Tex. 2015).  In a nonjury trial or hearing, "the trial court, as fact finder, 'is the sole judge of the witnesses' credibility and the weight to be given their testimony, and is free to resolve any inconsistencies.'"  *Iliff v. Iliff*, 339 S.W.3d 74, 83 (Tex. 2011) (quoting *Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 567 (Tex. 2000)); *see also City of Keller*, 168 S.W.3d at 819 (fact-finder "may choose to believe one witness and disbelieve another.  Reviewing courts cannot impose their own opinions to the contrary.").

[25]  Which is a question of law that we review de novo.  *See Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013) ("The ultimate question of whether a court has personal jurisdiction over a nonresident defendant is a question of law we review de novo."); *Schlais v. Valores Corporativos Softtek, S.A. de C.V.*, No. 03-11-00188-CV, 2012 WL 1499488, at *3 (Tex. App.—Austin Apr. 25, 2012, no pet.) (mem. op.) ("Whether, based on the facts, a court can exercise personal jurisdiction over a nonresident defendant is ultimately a question of law that is reviewed de novo.").

[26]  221 S.W.3d 569.

sending brochures and a release form to a Texas family (the Druggs) in the course of soliciting its business, "establish[ing] channels of regular communication with its Texas customers" through emailed advertisements, and placing advertisements in publications calculated to reach the Texas market.[27] Although Moki Mac's advertisements to the Texas market were admittedly more extensive than Formulators's were shown to have been here, the salient distinctions between that case and *Michiana* were that "the evidence in this case indicates that Moki Mac does intend to serve the Texas market,"[28] that "Moki Mac's contacts with Texas did not result . . . from the mere fortuity that the Druggs happened to reside here,"[29] and that Moki Mac "sought and obtained profit from Texas residents, with whom the company maintained communications."[30] The same is true of Formulators's actions in Texas, at least in regard to Rockford.

Perhaps even more critical are the district court's findings regarding Formulators's warranty and its efforts to honor that obligation. Formulators does not dispute—indeed, acknowledges—that "as a customer service" and "as part of honoring [Formulator's] warranty," it retained three contractors (Hintz, Hart, and Lepito) to provide services at Rockford's project site in Austin, and that its CEO Dickens similarly traveled to Austin to personally address product complaints. Formulators insists, however, that only the October 2010 visit by Hintz is relevant to our analysis because the others took place after Rockford's alleged injury occurred. For this proposition that we can only look to visits to Texas that occurred prior to Rockford's injury, not

---

[27] *Id*. at 577–78.

[28] *Id.* at 577.

[29] *Id.* at 578.

[30] *Id.*

after, Formulators relies on this Court's decision in *MedCost, L.L.C. v. Loiseau*, but that case spoke only to general jurisdiction, not specific jurisdiction.[31] An even more critical flaw in Formulators's contention is that this Court's assertion in *Loiseau* regarding the period for assessing contacts was abrogated by the Texas Supreme Court eight years ago.[32]

Formulators's post-injury contacts with Texas are probative of the nature of the relationship that Formulators contemplated with Rockford under its warranty and customer relationship. Such facts demonstrate that Formulators intended to establish the sort of "continuing relationships and obligations" with the Texas-based Rockford that constitute purposeful availment of that forum,[33] including performing future activities in Texas consistent with the parties' respective rights and obligations under the limited warranty it issued.[34]

---

[31] *See* 166 S.W.3d 421, 434 (Tex. App.—Austin 2005, no pet.) ("An assertion of general jurisdiction compels a more demanding minimum-contacts analysis than an assertion of specific jurisdiction and requires a showing of substantial activities within the forum state. . . . The relevant contacts are those up to the time of injury."), *abrogated by PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 169 (Tex. 2007).

[32] *See PHC-Minden*, 235 S.W.3d at 169 ("We first determine the appropriate time period for assessing contacts for purposes of general jurisdiction, an issue on which our courts of appeals are in conflict. . . . We conclude that the relevant period ends at the time suit is filed.").

[33] *See, e.g.*, *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338–39 (Tex. 2009) ("sellers who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to the jurisdiction of the latter in suits based on their activities"); *Moki Mac*, 221 S.W.3d at 578 ("the contacts of '[s]ellers who "reach out beyond one state and create continuing relationships and obligations with citizens of another state"' are purposeful rather than fortuitous") (quoting *Michiana*, 168 S.W.3d at 785 (quoting *Keeton*, 465 U.S. at 770)). *See also Shell Compania Argentina de Petroleo, S.A. v. Reef Exploration, Inc.*, 84 S.W.3d 830, 841 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) ("A trial court should examine a defendant's contacts with the forum state over a period that is reasonable under the circumstances, up to and including the date the suit was filed.").

[34] *See, e.g.*, *Michiana*, 168 S.W.3d at 787 (recognizing that certain contracts may represent purposeful availment where they contemplate multiple contacts with the forum state) (citing *Burger King*, 471 U.S. at 480; *McGee*, 355 U.S. at 223).

On appeal, Formulators does not dispute the remaining element of specific jurisdiction—that each of Rockford's claims arises from or is related to these same minimum contacts through which Formulators purposefully availed itself of conducting activities in Texas.[35] However, Formulators challenges the remaining requirement for personal jurisdiction—whether the assertion of jurisdiction by a Texas court is consistent with traditional notions of fair play and substantial justice.[36]  In making this determination, we "consider [Formulators's] contacts in light of:  (1) 'the burden on the defendant'; (2) 'the interests of the forum state in adjudicating the dispute'; (3) 'the plaintiff's interest in obtaining convenient and effective relief'; (4) the interstate or international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several nations or states in furthering fundamental substantive social policies."[37]  "'Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state.'"[38]  "To defeat jurisdiction," Formulators must present "'a compelling case that the presence of some consideration would render jurisdiction unreasonable.'"[39]

---

[35]  *See Kelly*, 301 S.W.3d at 658.

[36]  *See Spir Star AG v. Kimich*, 310 S.W.3d 868, 878 (Tex. 2010).

[37]  *Id.* (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991)).

[38]  *Id.* (quoting *Guardian Royal*, 815 S.W.2d at 231 (citing *Burger King*, 471 U.S. at 477)). *See also id.* at 872 ("Although this 'fair play' and 'substantial justice' test is well known to appellate courts, the expression is imprecise.  It gains meaning, however, when viewed in light of the 'minimum contacts' a defendant has with the forum. . . . Significant contacts suggest that the defendant has taken advantage of forum-related benefits, while minor ones imply that the forum itself was beside the point.  When a nonresident defendant has purposefully availed itself of the privilege of conducting business in a foreign jurisdiction, it is both fair and just to subject that defendant to the authority of that forum's courts.").

[39]  *Id.* at 878–79 (quoting *Guardian Royal*, 815 S.W.2d at 231).

The district court concluded that "it would be reasonable to exercise jurisdiction over Formulators . . . given Rockford's interest in obtaining relief, Texas's interest in adjudicating this dispute, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interests of the several States in furthering fundamental substantive social policies." It additionally concluded that "there is no undue burden on Formulators in adjudicating the dispute in Texas." Formulators urges that these conclusions are erroneous because there is "uncontradicted evidence" that requiring it to litigate in Texas would be "ruinous" for it. In support, Formulators relies entirely on the following testimony from Dickens:

Q. . . . What would happen if Formulators were forced to litigate this case here in Travis County?

A. Frankly, it would be financially devastating.

Q. How so?

A. Well, as I previously testified, there are three people in the office, and of the three, I do 99 percent of the work. I answer all -- all customer calls, all invoices, all documentation. I pay all the bills.

Q. Is this, say, a distracting experience for you?

A. Absolutely. I've actually had inquiries today that I cannot follow up on, and several that probably have already cost me business even today.

. . .

Q. . . . If Rockford were obliged to litigate this case in Orange County, California, which is Formulators'[s] place of residence, is that something that would be as burdensome?

A. No, of course not.

Q. Why is that?

A. Well, that's my location. It's close to my office. I have access to running my business there.

14

We cannot conclude that the district court erred. The fact that Formulators is headquartered in California cannot, by itself, defeat jurisdiction,[40] as it can be said of all nonresident defendants that subjecting them to suit in Texas will impose some burden on them.[41] In considering the weight to be given Dickens's claims of imminent "ruin" from Texas litigation due to Formulators's particular circumstances, the district court could have considered, among other things, its findings that Dickens had previously traveled to Texas to attend to customer accounts, including Rockford's, and had also traveled to Texas for the special appearance hearing, all without evident "ruin" to Formulators. This evidence falls far short of conclusively demonstrating "ruin" or undue burden if Formulators is required to litigate in Texas.[42]

The remaining factors weigh heavily in Rockford's favor. Texas has a significant interest in exercising jurisdiction over this controversy because it arises from injuries Rockford, a Texas resident, sustained from the Aquaflex product that Formulators purposefully sold in Texas

---

[40] *See Kimich*, 310 S.W.3d at 879 (citing *Guardian Royal*, 815 S.W.2d at 231 ("Nor is distance alone ordinarily sufficient to defeat jurisdiction: 'modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.'" (quoting *McGee v. International Life Ins. Co.*, 355 U.S. 220, 223 (1957)))). *See also TexVa, Inc. v. Boone*, 300 S.W.3d 879, 891 (Tex. App.—Dallas 2009, pet. denied) ("The fact that the appellees reside and work in California and it would be burdensome to litigate in Texas does not offend traditional notions of fair play and substantial justice. . . . [T]his argument has frequently been rejected as a basis for denying personal jurisdiction.").

[41] *See Moncrief Oil*, 414 S.W.3d at 155.

[42] *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) ("When a party challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which it had the burden of proof, the appealing party can prevail only if it demonstrates that the evidence conclusively establishes each of the required elements of an issue as a matter of law."); *Havner*, 953 S.W.2d at 711 (no evidence points may only be sustained when evidence establishes conclusively the opposite of the vital fact).

and that Rockford, as well as other Texas companies, purchased and used here.[43]  Any burden on

Formulators is mitigated by the convenience to Rockford of litigating in the forum where it allegedly

sustained injuries.[44]  Additionally, Rockford "has an interest in resolving this controversy in Texas

because that is where the litigation began."[45]  California does not have as significant an interest as

Texas does in resolving a claim for injuries sustained in Texas by a Texas resident.[46]  In this case,

the burden on Formulators is minimal and is outweighed by Rockford's and Texas's interests in

adjudicating the dispute here.[47]  Formulators has not presented "a compelling case that the presence

of some consideration would render jurisdiction unreasonable."[48]

---

[43] *See Kimich*, 310 S.W.3d at 879 ("Texas has a significant interest in exercising jurisdiction over controversies arising from injuries a Texas resident sustains from products that are purposefully brought into the state and purchased by Texas companies."); *IMV Techs. v. Ingram, LLC*, No. 10-13-00150-CV, 2013 WL 6051268, at *5 (Tex. App.—Waco Nov. 14, 2013, no pet.) (mem. op.) (same).

[44] *See, e.g.*, *Moncrief Oil*, 414 S.W.3d at 155 (burden on defendant somewhat mitigated by convenience to Texas resident of litigating in forum where trade secrets were allegedly appropriated and used); *IMV Techs.*, 2013 WL 6051268, at *5 ("Texas has an interest in adjudicating disputes involving Texas residents . . . ."); *see also Keeton*, 465 U.S. at 776 ("it is beyond dispute that [a forum] has a significant interest in redressing injuries that actually occur within the State").

[45] *Retamco*, 278 S.W.3d at 341.

[46] *See, e.g.*, *Moncrief Oil*, 414 S.W.3d at 156 ("no other jurisdiction has as significant an interest as Texas does in resolving a claim for a tort committed in Texas against a Texas resident").

[47] *See Kimich*, 310 S.W.3d at 879–80.

[48] *Id.* at 879.

16

In its sole remaining argument on appeal, Formulators re-urges a challenge it made below to the district court's subject-matter (as opposed to personal) jurisdiction.[49] The focus of this challenge, first raised by Formulators during the hearing on its special appearance, was that Rockford's live pleadings at the time had identified the plaintiff not as Rockford, but as the company's predecessor, Rockford Business Interiors, Inc., which had ceased to exist upon the 2010 merger through which Rockford was formed.[50] Relying on evidence of the corporate filings reflecting these transactions, Formulators insisted that the plaintiff, then identified as "Rockford Business Interiors, Inc.," lacked "standing" because it was a defunct entity. Following the hearing, but before the district court had ruled on the special appearance, Rockford filed a pleading amendment clarifying that it was the proper plaintiff. Thereafter, the district court signed its order denying Formulators's special appearance (and, impliedly, any challenge to subject-matter jurisdiction as well), and the court's findings of fact and conclusions of law reflect its determination that "Plaintiff McCoy-Rockford, Inc." is the proper party.

On appeal, Formulators urges that its "uncontroverted documentary evidence" compels dismissal of the cause for want of subject-matter jurisdiction. To the contrary, Formulators's evidence instead confirms that Rockford (i.e., McCoy-Rockford, Inc.) is the successor

---

[49] Although Formulators has invoked our jurisdiction solely under Tex. Civ. Prac. & Rem. Code § 51.014(a)(7), which is addressed to an interlocutory order that "grants or denies the special appearance of a defendant under Rule 120a, Texas Rules of Civil Procedure," we have jurisdiction to address whether the district court had subject-matter jurisdiction over the underlying cause. *See, e.g., State v. Cook United, Inc.*, 464 S.W.2d 105, 106 (Tex. 1971) (grant of appellate jurisdiction to review interlocutory order extends to prior rulings bearing on appealable order's validity); *see also Rusk State Hosp. v. Black*, 392 S.W.3d 88, 94 (Tex. 2012) (subject-matter jurisdiction can be raised for the first time on appeal, including in context of interlocutory appeals) (citing *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 851 (Tex. 2000) (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993))).

[50] *See supra* note 2.

in interest to Rockford Business Interiors, Inc., and is the proper plaintiff, and that the asserted "standing" defect amounted merely to an innocuous misnomer.[51] Formulators has made no attempt to demonstrate that it was somehow misled or placed at some disadvantage by the misnomer.[52] Regardless, Rockford's pleading amendment to correct the misnomer related back to the filing of its original petition.[53] The district court had subject-matter jurisdiction over the cause.

We affirm the district court's order overruling Formulators's special appearance.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Field

Affirmed

Filed:   October 14, 2015

---

[51] *See In re Greater Houston Orthopaedic Specialists, Inc.*, 295 S.W.3d 323, 325 (Tex. 2009) (per curiam) ("A misnomer occurs when a party misnames itself or another party, but the correct parties are involved.").

[52] *See Reddy P'ship/5900 N. Freeway LP v. Harris Cnty. Appraisal Dist.*, 370 S.W.3d 373, 376–77 (Tex. 2012) (per curiam) ("When the correct party sues or is sued under the incorrect name, 'the court acquires jurisdiction after service with the misnomer if it is clear that no one was misled or placed at a disadvantage by the error.'" (quoting *Sheldon v. Emergency Med. Consultants, I., P.A.*, 43 S.W.3d 701, 702 (Tex. App.—Fort Worth 2001, no pet.)).

[53] *See id.* at 377 (citing *In re Greater Houston Orthopaedic Specialists*, 295 S.W.3d at 326).